**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------------X**
**BORIS DAVIDOFF and**
**PROSPECTIVE INTERNATIONAL TRADING INC**

                                                      **File No.**

                        **Plaintiffs,**                **COMPLAINT**

            **-against-**

**NASIM SIDDIQI,**
**MOHAMED AMIN,**
**ANCHOR FINANCE GROUP, LLC,**
**ANCHOR CAPITAL INTERNATIONAL, LLC**
**STANDARD CHARTERED BANK**

                    **Defendants.**
**-----------------------------------------------------------------X**

Plaintiffs, BORIS DAVIDOFF and PROSPECTIVE INTERNATIONAL TRADING INC ("Plaintiffs" or "Plaintiff Davidoff") through their undersigned counsel, for their Complaint against Defendants NASIM SIDDIQI, MOHAMED AMIN, ANCHOR CAPITAL INTERNATIONAL, LLC, and ANCHOR FINANCE GROUP, LLC ("Defendants") allege as follows:

## <u>PARTIES</u>

1.    The individual Plaintiff is a person that resides in Nassau County, New York.

2.    The corporate Plaintiff is a corporation that is duly incorporated under the laws of the State of New York.

3.  Defendant NASIM SIDDIQI is a person that upon information and belief resides in Suffolk County, New York.

4.    Defendant MOHAMED AMIN is a person that upon information and belief resides in Nassau County, New York.

1

5.     Defendant ANCHOR FINANCE GROUP, LLC is a limited liability company that upon information and belief operates and is registered in the State of New York, with an operating address of: 105 Maxess Rd, Melville, NY 11803.

6.     Defendant ANCHOR CAPITAL INTERNATIONAL, LLC is a limited liability company that upon information and belief operates and is registered in the State of New York, with an operating address of: 105 Maxess Rd, Melville, NY 11803.

7.     Upon information and belief, Defendant NASIM SIDDIQI owns, operates, and controls both Defendant ANCHOR FINANCE GROUP, LLC and Defendant ANCHOR CAPITAL INTERNATIONAL, LLC.

8.     Upon information and belief, Defendant STANDARD CHARTERED BANK is a limited liability banking corporation that is organized under the laws of England and Wales, with its principal place of business and registered office located in London, United Kingdom. Defendant STANDARD CHARTERED BANK maintains a branch office, licensed by the New York State Banking Department as a foreign branch, located at 1095 Avenue of the Americas, New York, N.Y. 10036.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action under 12 U.S.C. § 632.

10.    This Court has supplemental jurisdiction over state claims under the principles of pendent and ancillary jurisdiction.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b)(c), because all or a substantial part of the events or omissions giving rise to the claims occurred herein.

## INTRODUCTION

12.    Plaintiffs are victims of a fraud and conspiracy by two individuals, primarily

based in Nassau County, New York, who were preying on unsophisticated local investors.[1]

13.     The individual Defendants conspired to fraudulently induce Plaintiff to invest over $81,595.31 into a purported shipping project of medical-grade rubber gloves that were intended to be procured inexpensively from a South Asian country (such as India or Thailand) and shipped to a MENA country (Middle East/Northern Africa) such as Dubai; and ultimately from Dubai to the U.S. where it was widely known medical-grade rubber gloves were in great demand. The shipping project developed by the individual Defendants (the "Project"), in reality, is nothing more than a façade under which Defendants misused, squandered and attempted to convert Plaintiff's investment funds to benefit themselves. Accordingly, as a result of the events described herein, Plaintiff unwittingly became one of any number of victims of personal protective equipment fraud ("PPE fraud") that was endemic in the NYC area at the height of the COVID-19 pandemic.

14.     While the individual Defendants marketed the Project to local investors including the Plaintiff as a way they could quickly obtain a profit in exchange for investing money in a potentially lucrative business venture, in reality the investment has essentially vanished due to Defendants' misrepresentations, material omissions, and negligence. As well, the representations made to induce Plaintiffs' investments into the Project were false and misleading, calculated to induce investments by trusting and unsuspecting local investors.

15.     The Project was doomed from the start and was created for Defendants' sole

---

[1] An action regarding this transaction was filed in Nassau Supreme Court as No.614801/2021. That action was dismissed for failing to state an action pursuant to CPLR § 3211(a)(7). This new action was filed in federal Court on the basis that a new Defendant, Standard Chartered Bank, renders the action eligible for federal question jurisdiction via the "Edge Act," a federal statute, codified at 12 U.S.C. § 632.

self-interest and benefit in that the Project's only chance for success hinged on the importer's expertise including their ability to successfully navigate the unique regulatory constraints of completing such a project by understanding the nuances to shipping via South Asian and MENA countries, which entailed understanding the corruption, payment obligations, currency risks and physical security threats prevalent in that part of the world.

16.     Defendants willfully failed to disclose this highly material information to investors including the Plaintiffs. Defendants knew that had they revealed this information as they are legally obligated to do, the investors would not have invested in the Project, and would have demanded their investment funds back or requested that the investment funds be directed to a new and less risky project.

17.     The individual Defendants' self-interest in the Project was sole reason this information was not communicated and disclosed to the investors.

18.     As such, Defendants willfully did not disclose to investors that the Project was not headed by an experienced importer/exporter or logician at the helm, but by Defendant Mohammed Amin who, in total shipping experience, had what would be considered paltry or "novice" experience, and was clearly insufficient for a Project of this magnitude.

19.     Defendants also willfully did not disclose to investors that the Defendants' agents based in India and Dubai were both newly retained agents by the Defendants, and were untested as to whether they were trustworthy shipping agents, or whether they contributed to the pervasive problems with corruption, and physical security threats in that area of the world. Details learned after February, 2021, would show that the answer was the latter.

20.    Defendants' willful and contumacious conduct to induce and defraud investors was continuous and pervasive, and the misrepresentations communicated to Plaintiff were false and intentionally misleading. These statements included, but were not limited to that Defendant Mohamed Amin was highly experienced in shipping, sourcing, quality control, and compliance when he was clearly not for the reasons learned after February, 2021. Also that the transaction was 100% safe and risk-free when, in actuality, shipping from the MENA region actually represented an inherently corrupt, uncertain, ever-changing regulatory and tax climate that required risk-analysis and also required particular expertise that the individual Defendants did not have.

## DEFENDANT MOHAMED AMIN

21.    Defendant Mohamed Amin ("Amin"), a resident of Nassau Country, was at the helm of the Project and was the individual that initially solicited and falsely represented the Project to the individual Plaintiff with the material misrepresentations as follows:

a)  That there was no inherent risk in shipping commodities via South Asian countries to Dubai, then from Dubai to the U.S. when he knew that shipping via a MENA country entailed understanding nuances involving corruption, payment obligations, currency risks and physical security threats prevalent in that part of the world that he did not appreciate.

b)  That he was a highly experienced importer/exporter and that he could also provide services relative to the sourcing, quality control, and compliance needed for successful shipping of personal protective equipment to the U.S., when in actuality the extent of his experience in international shipping was at a novice level, and his

actual experience was paltry. Details learned after February, 2021, revealed that the extent of Amin's experience in international shipping since 2010 was a very scant shipping volume, as determined by the public records of two shipping corporations incorporated in India and New York State that were owned by Amin. Public records obtained after February, 2021 disclosed that the total volume of goods shipped by Amin's two corporations was:

    I)    approximately $15,000 USD for his Indian corporation that was incorporated in 2010 and dissolved on or about the middle 2010s;

    II)    approximately $200,000 USD for his New York corporation that was incorporated in 2018. Because Plaintiff Davidoff and his co-victim (Faruk Kwaja) contributed over $140,000 towards the Project in 2021 ($81,595.31 by Plaintiff Davidoff and approximately $60,000 by Faruk Kwaja), this would essentially entail *one* other relatively small shipping project with a volume of goods shipped of some amount under $60,000 USD (in addition to the $140,000 Project described herein).

c) That he had arm's length contacts with licensed and trustworthy shipping brokers in India, Dubai, and the MENA region, when the true extent of his contacts were newly acquainted agents that Amin had, upon information and belief, never worked with previously, and who had no experience whatsoever in shipping or sourcing commodities such as personal protective equipment. The agents that were intended to be used in the Project included:

    I)    <u>FIROZ KHAN</u> – was an individual based in UTTAR PRADESH, INDIA that purported to work as a shipper of goods. Public records

obtained after February, 2021 would disclose that upon information and belief Firoz Khan had a past criminal record charge in India equivalent to felony robbery, in which he was acquitted of on or about 2006. Upon information and belief, this individual also had no experience whatsoever in shipping or sourcing of personal protective equipment prior to his participation in the Project.[2]

II) <u>NUSRAT KHAN</u> – was an individual based in DUBAI, UAE who purported to work as a shipper of goods. Events learned after February, 2021 would reveal that, upon information and belief, and as further set forth in detail herein, Nursat Khan would describe to Amin that during the course of the shipment from South Asia to Dubai, a non-party to this suit purportedly pilfered half of the $81,595.31 intended for purchase of the rubber gloves that was wired by Plaintiff Davidoff, thus dooming the Project.

**<u>DEFENDANT NASIM SIDDIQI:</u>**
**<u>OWNER AND OPERATOR OF DEFENDANT ANCHOR</u>**
**<u>CAPITAL INTERNATIONAL, LLC and DEFENDANT</u>**
**<u>ANCHOR FINANCE GROUP, LLC.</u>**

22. Defendant Nasim Siddiqi ("Siddiqi"), also a resident of Nassau Country, purported to be Amin's partner in the Project.

23. The background of Defendant Siddiqi was that he was purportedly broadly experienced in the banking/international banking industry. Public information cites

---

[2] Firoz Khan was partnered with one Nursat Khan, who was based in Dubai, UAE, in that Firoz Khan would purportedly procure the rubber gloves to be shipped from its place of procurement in South Asia by air, and Nusrat Khan would purportedly then subsequently arrange shipment from Dubai to the U.S. by cargo ship.

Defendant Siddiqi as holding positions as: a Global Bank of Commerce employee that is based in Antigua, N.A.; a past Sterling Trade Capital vice president and director of business development; and currently as the President of Anchor Capital Group, LLC, a Long Island-based international banking and investment strategy consulting company.

24.     Defendant Siddiqi's Linkedin page states: "[*He*] *is responsible for all aspects of the firm's international banking, investment strategy, team, and operations across Anchor Group's affiliated global network. Nasim has worked and lived in Asia, the Caribbean, Central & South America, East Africa, and the United States. His working history is mirrored by the wide scope of his international banking, consumer & investment banking that stretch across multiple sectors and geographies.*" Defendant Siddiqi's Linkedin page further states he holds bachelor's degrees in banking & finance and that: "*he has done extensive work in the Islamic banking arena in North America and in the MENA region*."

25.     Siddiqi, whose expertise Plaintiff Davidoff relied upon, and whose participation in the Project was a substantial factor in Plaintiff Davidoff's decision to invest in the project, had full knowledge of the perils of shipping via the MENA region given his background, and failed to disclose this information as he knew full well many investors including Plaintiff would pull out of the Project. As such, Siddiqi had committed a material omission of fact in that: 1) Siddiqi made the material omission not to disclose the inherent danger of the MENA region shipping; 2) and Siddiqi made the material omission not to disclose Amin's gross inexperience in shipping, including sourcing, quality control, and compliance.

## TIMELINE FROM START TO END:

26.     Upon information and belief, prior to January, 2021, Defendant Siddiqi and Defendant Amin adopted a plan to purchase and distribute medical-grade rubber gloves (*i.e.* personal protective equipment or "rubber gloves") that were manufactured in South Asia, then shipped air to a MENA country, and further shipped by cargo ship to distributors in the United States ("Siddiqi business plan").

27.     Upon information and belief, however, both Siddiqi and Amin came to realize that the Siddiqi business plan was not a safe bet or a sure thing based on pervasive problems with corruption, payment obligations, currency risks and physical security threats in that area of the world.

28.     As well, importers from that part of the world must deal with bureaucratic minefields, and an uncertain, ever-changing regulatory and tax climate. As a result, companies looking to enter the region must conduct a careful risk analysis. However, Siddiqi and Amin also came to realize that the profit margin for a shipment from that part of the world would be very large if it safely arrived at its destination (*i.e.* big risk/big reward).

29.     Upon information and belief, Siddiqi and Amin commenced logistically planning the business plan of a shipment from a MENA country, and that they would communicate their plan to (a) willing investor(s) who would be willing to invest the money to back the shipping of the crate of rubber gloves in order to reap the reward of the rubber gloves being sold in the United States for roughly several times their exported value resulting in a large profit.

## SCHEME TO DEFRAUD

30.     Upon information and belief, and because Siddiqi and Amin desired to invest as

little of their own money as possible in the Siddiqi business plan, Siddiqi and Amin developed a scheme to gain the confidence of an investor and induce him to unwittingly finance the Siddiqi plan by inducing the investor to provide Siddiqi money towards a purchase of the rubber gloves inventory, wherein Siddiqi and Amin would take a cut of the investor's money, and also pay for the inventory of rubber gloves with the rest without disclosing the risks of shipping from a MENA country (such as corruption, physical security threats, etc. Hereinafter, "scheme to defraud"), and without disclosing to the investors that they should conduct a risk analysis.

31.   Upon information and belief, at all times relevant, Siddiqi and Amin engaged in concerted actions to obtain the objectives of the scheme to defraud through deceit, misrepresentations of facts, omission of material facts, false confidence, and unfair dealing.

32.   Upon information and belief, at all times relevant, Amin had the role individually and on behalf of Siddiqi of finding and cultivating an investor who was unsophisticated in the international import/export industry.

33.   Upon information and belief, and at all times relevant, Siddiqi and Amin acted conspiratorially and as agents, both disclosed and undisclosed, with and for each other in furtherance of their scheme to defraud.

34.   As part of the scheme to defraud, and at all times relevant, Amin falsely portrayed and represented himself as highly sophisticated in the international import/export industry and presented that he had substantial business relationships with many local and international commodity exporters, and industry leaders in the MENA region including Siddiqi and others.

10

## FIRST TARGET BORIS DAVIDOFF

35.    Upon information and belief, as part of their scheme to defraud, Siddiqi and Amin identified their first target investor as Plaintiff Davidoff.

36.    Plaintiff Davidoff is an investor from Nassau County who, among other things, invests money in business ventures from time to time based, in part, upon representations made to him concerning the investment venture.

37.    The individual Plaintiff was unsophisticated in the importing/exporting industry when targeted by Siddiqi and Amin.

38.    A number of months prior to February, 2021, the individual Plaintiff had worked collaboratively in an unrelated undertaking in the Island of Antigua, N.A. with Siddiqi and Amin, having thereby developed a relationship of trust with them.

39.    Siddiqi and Amin knew that the individual Plaintiff was unsophisticated in the importing/exporting industry.

40.    At some point before February, 2021. Siddiqi and Amin, having now targeted Plaintiff Davidoff, and knowing Plaintiff Davidoff had money to invest, advanced their scheme to defraud whereby they would make false representations to Plaintiff to induce Plaintiff to provide money to Defendants under false pretenses.

41.    Siddiqi and Amin's scheme was to present to Plaintiffs a false picture of Siddiqi and Amin: 1) In an arm's length relationship with a number of trustworthy exporters and other agents in the MENA region, 2) to present Amin as a highly experienced and reliable shipping, sourcing, quality control, and compliance professional, and then to portray the Siddiqi business plan as an legitimate and guaranteed investment opportunity for

11

Plaintiff.

42.     The object of Siddiqi and Amin's plan was to induce Plaintiff to provide money to Defendants by offering Plaintiff Davidoff an agreement for him to pay money that would result in a return on investment in the Siddiqi business plan.

43.     Upon information and belief, as part of their scheme to defraud, and in approximately February 2021, Siddiqi and Amin attempted and succeeded to defraud Plaintiff Boris Davidoff into purportedly financing the purchase of the rubber gloves.

44.     Upon information and belief, as part of their scheme, Siddiqi and Amin defrauded Plaintiff into providing a substantial sum of money through a constant pattern of fraud, deceit and misrepresentation, to induce Plaintiff without disclosing to him that Siddiqi and Amin had a secret business plan with each other.

45.     That, Siddiqi and Amin never disclosed to Plaintiff that they were working in secret collaboration with each other and instead represented to Plaintiff that they were working as partners and agents with respect to the Project.

46.     To induce Plaintiffs to provide money to Siddiqi and Amin towards the Siddiqi business plan, Siddiqi and Amin represented to the individual Plaintiff the following, coinciding with the below dates:

        a.    In text message on January 27, 2021 to Amin who represented that he was planning to meet with Plaintiff Davidoff and Siddique at Siddiqi's business address at 105 Maxess Road, Suite 124S, Melville, NY, 11747, County of Nassau the following day at approximately 1:00 pm to discuss the Siddiqi business plan. Also in that text, Amin asked Plaintiff Davidoff to "kindly fill in the information" for the letter of credit that would be used to pay for the proposed inventory of rubber gloves that would be shipped.

b.      On January 28, 2021, at Siddiqi's business address at 105 Maxess Road, Suite 124S, Melville, NY, 11747, County of Nassau, Plaintiff, Siddiqi, and Amin met to discuss the Project wherein Siddiqi specifically represented that the transaction was guaranteed with no risk as a result of Siddiqi's expertise in banking, and experience with security instruments, such as letters of credit, which would only permit payment after release of the shipment of rubber gloves on the receiving end, and would be assured by his banking "contacts" at the issuing bank, Standard Chartered Bank. Also that Plaintiff would receive the principal of his investment back if for whatever reason the transaction did not occur. And that due to the demand for PPE, Plaintiff would certainly receive a "double" return on his investment of $81,595.31 in "40 days." Also Siddiqi represented Plaintiff would receive a "50% share" in the ongoing business pertaining to PPE shipping and re-sale in the U.S. Amin reiterated that he was greatly experienced, and had known the transport routes, and trusted the contacts, with whom he had worked with previously, in order to eliminate any risk from the transaction by virtue of his experience in sourcing, quality control, and compliance. Siddique confirmed Amin's representations.

c.      On January 28, 2021, at Siddiqi's business address at 105 Maxess Road, Suite 124S, Melville, NY, 11747, County of Nassau, Siddiqi said in particular to the letter of credit: "You are also assured that payment or acceptance will not be made unless the documents called for under the letter of credit and the terms and conditions of the letter of credit are strictly complied with," thereby guaranteeing the Project.

d.      On January 28, 2021, at Siddiqi's business address at 105 Maxess Road, Suite 124S, Melville, NY, 11747, County of Nassau, Siddiqi also said in particular to the letter of credit: "You maintain control over the transaction through the letter of credit mechanism. You can, for example choose date for shipment, and specific documentary requirements all of which are irrevocable and therefore you require the agreement of the beneficiary of the letter of credit *i.e.*, the exporter."

13

e.     On January 28, 2021 at a restaurant located in Nassau County, both Siddiqi and Amin represented and reiterated that the deal was safe with no risk; that they had trustworthy shipping agents working overseas; that the deal was guaranteed, and that Plaintiff would be made a "50%" partner of a long-term collaboration and ownership interest given they had all the pieces in place (i.e. "contacts" and "trustworthy agents") to have a long-term alliance.

f.     In a phone call on February 3, 2021 to Siddiqi to confirm that Plaintiff Davidoff has wired $81,595.31 to Siddiqi's company, Anchor Capital International, LLC.

47.    That Siddiqi and Amin knew that the Siddiqi business plan presented to Plaintiff was very risky, and that their scheme to defraud involved taking Plaintiffs' money so as to be able to then execute a plan solely for the benefit of themselves, and Plaintiff never being ultimately provided his 50% ownership interest as professed by Amin and Siddiqi.

### SECOND TARGET FARUK KWAJA

48.    Upon information and belief, another target of Siddiqi and Amin's Siddiqi business plan and their scheme to defraud was Faruk Kwaja.

49.    Faruk Kwaja contributed $60,000 to the same scheme to defraud on or about the same time that Plaintiff Davidoff wired his contribution.

50.    Faruk Kwaja received no profits from his deposit of $60,000, nor any portion of the $60,000 principal transferred to Siddiqi and Amin at any point after February, 2021.

51.    Upon information and belief, Faruk Kwaja was thus defrauded by Siddiqi and Amin in the same manner as Plaintiff Davidoff.

### THE AGREEMENT BETWEEN THE PARTIES

52.    As set forth above, on January 28, 2021, at Siddiqi's business address at 105

Maxess Road, Suite 124S, Melville, NY, 11747, County of Nassau, Plaintiff, Siddiqi, and Amin met with Plaintiff Davidoff with the objective to solicit money towards the Project.

53.     During the course of that meeting, Plaintiff verbally agreed with both Siddiqi and Amin to wire a $81,595.31 advance to Siddiqi's company, Anchor Capital International, LLC in return for certain consideration from both Defendants, including a promise of a return of "double" Plaintiff's wire transfer (*i.e.* $163,190.62) within 40 days from the date of the wire transfer.

54.     Also as set forth above, the nature of the return on the advance entailed the purchase of rubber gloves inventory that was intended to be procured and shipped to the United States for re-sale by international shipping agents that were vouched for by both to by Amin and Siddiqi.

55.     Plaintiff accepted the verbal contract at that time offered by Siddiqi and Amin, and proceeded to send by wire transfer $81,595.31 to Anchor Capital International, LLC (proof of wire transfer annexed hereto from TD Bank) on February 3, 2021.

56.     The terms of the agreement negotiated between Plaintiff Davidoff and Siddiqi and Amin (the "Davidoff Agreement") included the following:

a) a promise to pay a "double" return (*i.e.* $163,190.62) to be paid out in exchange for the $81,595.31 wire transfer to Anchor Capital International, LLC within the deadline of 40 days from the date of the wire transfer.

b) a promise that the principal of $81,595.31 was 100% returnable to Plaintiff Davidoff if the Project was not completed for whatever reason based on

15

Siddiqi's professed expertise in drafting and arranging for the letter of credit that was intended as security and final payment <u>only</u> upon the release of the inventory of rubber gloves (*i.e.* "no gloves/no payment")

c) a "50%" share in an import/export company headed by Plaintiff Davidoff, Siddiqi, and Amin, and  that would result in further profits after the said 40 days, once the initial "double return" would be paid to Plaintiff, with further details that would be determined.

d) a letter of credit to be arranged by Siddiqi and submitted to Standard Chartered Bank as the issuing bank of the payment, in order to provide proof of payment funds for the overseas shipping agents for purchase of the inventory of rubber gloves, as well as to secure the obligation to reimburse the exporters' fees for the rubber gloves – which was to be completed by Siddiqi on or shortly after February 3, 2021.

e) a promise that Siddiqi's fees, which were agreed to be approximately 10% of the deposit as a preliminary fee for arranging the letter of credit at Standard Chartered Bank.

f) Siddiqi would purportedly use the said $81,595.31 (minus his 10% fee) as security in order for Standard Chartered Bank to issue the letter of credit to the overseas receiving bank, which was purportedly Citibank in Dubai, and was intended to constitute proof of payment, and also result in the issuing bank sending the $81,595.31 (minus Siddiqi's fees) to the receiving bank, Citibank, thus directly paying for the overseas inventory of rubber gloves to

16

be released for shipment.

57.    The parties' verbal agreement is clearly and unequivocally referable to the Davidoff Agreement.

58.    Plaintiff Davidoff's wire payment of $81,595.31 from his corporation, Plaintiff Prospective international Trading Inc, to Defendant Anchor Capital International, LLC, Defendant Anchor Capital International, LLC's acceptance of that amount, is clearly and unequivocally referable to the Davidoff Agreement.

59.    Siddiqi's submission of a letter of credit to Standard Chartered Bank and Siddiqi's use of the $81,595.31 to pay his fees and arrange for the deposit of collateral to Standard Chartered Bank in order to issue a letter of credit for that amount is clearly and unequivocally referable to the Davidoff Agreement.

60.    As set forth in the following paragraphs, Siddiqi and Amin's partial return of Plaintiff's principal investment in the amount of $20,000 is clearly and unequivocally referable to the Davidoff Agreement.

61.    No corporate documents were signed at the meeting that memorialized the Davidoff Agreement, thus each individual Defendant thus bound themselves individually.

## LETTER OF CREDIT

62.    International business transactions such as the ones described in this Complaint typically involve payment obligations effectuated through "letters of credit." Buyers and sellers use letters of credit ("LCs") to reduce the risk of nonpayment in connection with large business transactions. In short, before a seller will ship goods to a buyer, the buyer has its

bank agree to pay the seller the contract price after the seller has shipped the goods.

63.     After the buyer and seller have a contract to purchase, the buyer applies for an "issuing bank" to issue a LC in favor of a specified "beneficiary" - typically the seller - for a specific amount and with specific terms as to how and when the LC can be redeemed. When presented with certain documents specified by the LC itself, the issuing bank (again, the buyer's bank) must pay the face value of the LC to whomever presents the documents, whether the beneficiary (typically the seller) or a third party.

64.     After the LC has been issued, the seller delivers goods under the original contract to a "common carrier" in exchange for the bill of lading, which signifies that the carrier will ship the specified goods to a certain location at a certain time.

65.     The seller then presents the bill of lading and whatever other documents might be required to the seller's bank (the confirming bank), who then transmits these same documents to the buyer's bank (the issuing bank). After all of the documents have been presented to the issuing bank, the issuing bank is obligated to pay the presenting party - either the beneficiary/ seller or the confirming bank - the face value amount of the LC, irrespective of any contrary instructions from the buyer. After receiving payment from the issuing bank, the confirming bank then remits payment to the seller. Finally, the buyer pays the issuing bank.

66.     Because the issuing bank in concert with the buyer can demand specific compliant documents, or even photos of the compliant export as evidence the shipment is genuine, the risk of loss for the importer is generally minimal with a competently prepared

LC, and also with trustworthy and experienced shipping brokers, since the beneficiary would not be able to draw on it without releasing evidence of a compliant export such as compliant documents by the beneficiary, or on other particular terms.

67.    Because LCs can be considered security interests as well as contracts, there is the possibility of a beneficiary to transfer, assign, or otherwise deal with the LC in such a manner that the LC could in theory be drawn upon without releasing the shipment if the particular terms, in accordance with the contract law of the applicable jurisdictions as well as the Uniform Customs and Practices for Documentary Credits Rules.[3]

68.    In sum on this topic, the preparation of an LC for a particular transaction is an extremely nuanced and specialized area that requires particular expertise as well as experience.

69.    As set forth earlier, with an import letter of credit, the issuing bank can authorize another bank (Here, Citibank in Dubai, the exporters' country) to effect such payment, or to accept and pay such bills of exchange on a fixed future date, on compliant documents by the beneficiary, or on other particular terms.

70.    Also as set forth above, at the meeting on February 28, 2022 between Plaintiff Davidoff, Siddiqui and Amin, Siddiqi represented to Plaintiff Davidoff that he had particular expertise in the preparation of all forms of letters of credit for shipping, and that the Project at bar would not have any risks because he would draft the letter of credit in such a manner

---

[3] Most of the applicable rules governing transfers and assignments of LCs are governed by the Uniform Customs and Practices for Documentary Credits, a collection of rules promulgated by the International Chamber of Commerce. Under The UCP 500 and 600 are collections of rules that commonly governs the issuance and redemption of LCs. Although not an official statement of any law or regulation, the UCP has been promulgated by the International Chamber of Commerce and governs an overwhelming majority of LCs issued in connection with international business transactions.

that release of the rubber gloves inventory would necessarily need to occur and be confirmed before the exporters would receive payment from the issuing bank, thereby "safeguarding" the transaction, akin to the fruition of escrow conditions in a real estate transaction before the payment of the property, or keys to the property can be released.

71.    In Siddiqi making the representation to Plaintiff Davidoff, plaintiff made clear to Siddiqi that Plaintiff had no experience concerning letters of credit, and that Plaintiff was entrusting Siddiqi to supply the relevant information and expertise.

72.    Siddiqi, in turn, held himself out to Plaintiff as having expertise and superior knowledge concerning letters of credit. Specifically, that he had decades of experience concerning LCs in the context of international business transactions.

73.    Siddiqi was aware that Plaintiff was depending on Siddiqi to accurately and prudently advise plaintiff concerning the letter of credit as well as the suitability of the issuing bank.

74.    Accordingly, as a result of Siddiqi's special expertise, a special relationship of trust justifiably existed between Siddiqi and Plaintiff, which Siddiqi was aware of because Siddiqi supplied it for that purpose.

75.    Siddiqui's purported long-standing and close banking relationship with Standard Chartered Bank, the known imbalance of information and expertise concerning letters of credit between these parties, and the trust and confidence Plaintiff placed with Siddiqi, and that Siddiqi assumed to advise Plaintiff concerning the letter of credit and the transaction accordingly gave rise to a special relationship between Siddiqui and Plaintiff at

that point in time.

76.    On or shortly after February 28, 2021, Plaintiff Davidoff contacted his personal attorney to conduct a background check of Siddiqi in order to conduct his due diligence on the transaction. Plaintiff's attorney's informed Plaintiff Davidoff approximately 2 days later that Siddiqi did not have a criminal record, nor had he been sued in recent history – and that all indications were that he was a legitimate business owner.

77.    As set forth above, in reliance upon Siddiqi's advice concerning the safety of the transaction, Plaintiff Davidoff sent $81,595.31 via wire-transfer from his corporate account to Siddiqi's LLC, Anchor Capital International, LLC for the promise that the amount would be doubled in 40 days.

78.    Plaintiff Davidoff's reliance upon Siddiqi included entrusting him to give him full authority to determine the specifics in regards to the letter of credit that would ultimately be safeguarding the Project, which included, but was not limited to: specific quantities of goods, shipping date, origin, destination, type of payment, and banking details.

79.    Upon information and belief, Siddiqi deposited the $81,595.31 payment from Plaintiff that Plaintiff wired to Siddiqi's company, Defendant Anchor Capital International, LLC, minus his fees to an account in Standard Chartered Bank.  That sum was used as collateral to for Standard Chartered Bank to issue the letter of credit, which was issued by Standard Chartered Bank on or shortly after February 3, 2021.

80.    Upon information and belief, the letter of credit issued by Standard Chartered Bank was provided to the receiving bank, Citibank's branch located in Dubai, to the

beneficiary, Nursat Khan.

81.     Upon information and belief, the letter of credit was prepared in such a manner that the individual Plaintiff was listed as the Applicant, whereas Siddiqi was an agent of the individual Plaintiff.

82.     Upon information and belief, Siddiqi took his agreed-upon 10% fee in order to arrange for the letter of credit from Standard Chartered Bank.

83.     Upon information and belief, Nursat Khan procured the shipment intended to be purchased on or about March 5, 2021.

84.     Upon information and belief, the shipment was procured and was leveraged to be purchased via the letter of credit that was prepared by Siddiqi.

85.     Upon information or belief, Nursat Khan forwarded the evidence of a letter of credit to the purported seller in order to purchase the products shortly after March 5, 2021.

86.     Upon information and belief, neither Amin, Siddiqi, or Nursat Khan conducted a background check of the purported seller in accordance with their due diligence.

87.     As set forth in greater detail below, the purported seller that Nursat Khan contacted was, upon information and belief, able to circumvent the LCs requirements for compliant documents was due in part to the rampant LC fraud that is endemic to the South Asian/MENA region.

88.     Upon information and belief, the seller was able, with a formal LC in hand, to turn the LC into cash using a secondary scam (the "secondary scam"), by either presenting forged conforming documents, or by monetizing the LC, which is related to showing the LC

as evidence that "others" have already signed on or provided funding some other product or investment, or even real estate. In other cases, the scammer may go to a legitimate bank and obtain a loan or mortgage based on the dollar figures quoted on LC, which the scammer uses to "prove" their income.

89.     Upon information and belief, the said circumvention resulted in at least the partial debiting of Plaintiff's monies in the Standard Chartered Bank account relating to the letter of credit in furtherance of the secondary scam.

90.     Upon information and belief, the partial debiting of Standard Chartered Bank account in regards to the account relating to the letter of credit was achieved despite that the holder of the LC did not legitimately meet any of the criteria that would be reasonably required from a seller of the shipped goods, such as documents that prove conformation of the goods, photographs of the conforming goods, or other evidence.

## COLLAPSE OF THE PROJECT

91.     In May, 2021, prior to then not knowing of the scheme to defraud, and believing he was an investor in a legitimate business plan, Plaintiff began to suspect he was quite likely involved in a spurious transaction when Siddiqi and Amin defaulted on their promise and were not able to deliver a double return on Plaintiff's $81,595.31 within the professed "40 days."

92.     Accordingly, at that time, Plaintiff demanded the immediate return of the principal as they had promised. Amin's response to Plaintiff's demand  was that the money Plaintiff had wired Defendant Anchor Capital International, LLC was "gone," as according to Amin – with the individual Defendants refusing to further elaborate how a professed safe

investment towards a letter of credit for the purchase of inventory could have disappeared; and also neither adequately explaining what had actually occurred to the supposedly procured stock of inventory of medical-grade rubber gloves that appeared to have vanished into thin-air.

93.    Nevertheless, Amin continued to profess that the principal of Plaintiff's investment was still purportedly retrievable as a result of the safeguards in the letter of credit that was prepared by Siddiqi.

94.    Subsequently thereafter, Amin then gave Plaintiff two checks as a purported amends and reimbursement of Plaintiff's principal. One of the checks was a certified bank check for $20,000.00 as a partial return of Plaintiff's $81,595.31 principal. Plaintiff accordingly cashed the check for $20,000.00 and accepted it as part return of his principal investment.

95.    The second check was for $61,400.00 and was dated "7/31/21". Amin instructed Plaintiff that the money for the second check would be in the account by July 31, 2021, and instructed for Plaintiff not to cash the check until that date.

96.    While the Defendants' actions to reassure the Plaintiff allayed some of the Plaintiff's concerns for a time, it did not eliminate them entirely. Though Plaintiff at this time sought redemption of his investment principal which the Defendants, particularly Amin, promised they would return, events that were learned after August, 2021 disclosed, however, that the principal would ultimately not be redeemed.

97.    At that time, upon information and belief, Defendants Amin and Siddiqi collaborated and conspired with one another to further the ruse that the investment in the

24

Project was still retrievable when, in fact, it was not.

98.     The Defendants, acting in concert and as co-conspirators, then worked with one another to manufacture reasons for the delay in redemption as a stall tactic to keep the Plaintiff at bay. Their excuses were, of course, false because the entire premise of the Project was based on deceit.

99.     Siddiqi and Amin represented to the individual Plaintiff the following, coinciding with the below dates in a purported effort to try and retrieve Plaintiff Davidoff's investment principal:

> a.     In a text message on April 27, 2021 to Siddiqi, where Plaintiff Davidoff sought to recover at least the principal of his investment of $81,5095.31 and represented that he requested for Siddiqi to arrange to return his principal as promised. Siddiqi responded for Plaintiff to contact Amin, and then sent a text of what purported to be an automated message that the texter was driving, and to please contact him later.

> b.     In a text message on July 29, 2021 from Amin to Plaintiff Davidoff: "This is to inform that LC charges recovery is in progress. It may take a few more weeks to get it reimbursed…kindly hold and do not deposit the company check for 61,400 until I get you the certified check for 61,400.

> c.     In a text message on July 30, 2021 from Plaintiff Davidoff to Amin, Amin texted to Plaintiff: "We are making progress to collect. Will advise you soon on the Certified Bank Check for balances." In a representation to Plaintiff that the principal would be available in a certified bank check.

100.    Plaintiff attempted to cash the check on August 13, 2021. On August 16, 2021, the check was returned as having "NON SUFFICIENT FUNDS." Amin represented to the individual Plaintiff the following, coinciding with the below date in a purported effort to

further try and retrieve Plaintiff's investment principal:

      d.     In a text message on August 24, 2021 from Amin to Plaintiff Davidoff: "I received this from the bank [picture of a notice of overdrawal]. I requested that you hold the check until I recover the money from Mr. Nasim per our last conversation."

101.  Plaintiff, by way of the totality of the communications, realized that, like Defendants' initial representations, Defendants purported efforts were misrepresentations used to manipulate and keep Plaintiff at bay, as well as calculated to mislead Plaintiff.

102.  Plaintiff's recognition was strongly supported by the assistance of a non-party to this suit, Shahid Iqbal, who had been a colleague of both Siddiqi and Amin, and who had investigated the matter at the request of Plaintiff.

103.  In an email from Siddiqi sent on July 1, 2021, Plaintiff, Shahid Iqbal disclosed to Plaintiff Davidoff that Siddiqi had emailed to him the following in regards to the Project:

*"I strongly suggest that you stand down in this matter, as Dr. Amin is handling the situation nicely. In the worst case scenario we will manage with Dr. Boris."*

104.  Thus, the email was written verification that Defendants had indeed conspired with one another in a concerted, deliberate effort to manipulate *("...we will manage...")* Plaintiff in furtherance of the scheme to defraud.

105.  Purported events learned from non-party Shahid Iqbal after February, 2021 revealed that the Project allegedly unraveled when Nursat Khan allegedly did not provide the shipment of rubber gloves intended to be shipped to the U.S.  – but rather, as set forth formerly, in keeping with the professed minefield of corruption, currency risks, kickbacks, and physical security threats in the MENA region, was alleged to state to Amin that another

third party had pilfered half the money at some point in the supply chain – and that he could purportedly only retrieve roughly half of the money, or allegedly around $40,000, in refund to Amin from the letter of credit, which Amin purportedly unilaterally accepted from Nursat Khan during one of two trips to Dubai that Amin had allegedly made of his own accord at some point after February, 2021.

106.   Further purported events that occurred and were learned after February, 2021 disclosed the following:

a)   that the shipment of rubber gloves was procured by Nursat Khan on or about  March 5, 2021, which was intended to be shipped to Dubai, and then to the U.S. by cargo ship;

b)  That the type of rubber gloves purchased were, upon information and belief, "Nitrile Gloves", in which the place of origin was South Asia;

c)  Upon information and belief, the "Nitrile Gloves" that was procured was chosen as the brand to be shipped for the simple reason that it was the most inexpensive brand, without regard to any quality control;

d)  Upon information and belief, neither Amin, Nursat Khan, nor any of Amin's other agents conducted any sourcing, quality control, nor compliance of any kind to ensure the "Nitrile Gloves" were compliant with U.S. standards, contrary to Amin's representations to Plaintiff as set forth previously;

e)  Upon information and belief, since in April 2020, approximately 3,411 shipments of prohibited, fraudulent and/or counterfeit items related to the Covid-19 pandemic were prevented from reaching medical treatment

27

facilities and first responders in the U.S.[4] Accordingly, PPE fraud was thus rampant at the height of COVID on or about the spring of 2021;

f) Upon information and belief, one of the brands Nursat Khan had procured included "Skymed Nitrile Gloves" based in Thailand have in recent months has been known to have been operating an international scam;

g) The said international scam entailed the use of egregious fraud, such as that shipments ordered by "Skymed Nitrile Gloves" have been known to simply take the purchasing fee, and not release the product, thereby pilfering it; or, alternatively

h) That the shipment of "Skymed Nitrile Gloves" was shipped, but the received export of gloves were non-conforming, non-usable, and some even visibly re-used with stains and other contaminants;

i) That multiple law enforcement agencies of Thailand had effected arrests and charged criminal fraud charges on the individuals that perpetrated the fraud that were associated with "Skymed Nitrile Gloves."[5]

107. Accordingly, with the purported seller having the ability to debit at least part of the monies from the letter of credit as set forth formerly herein via the secondary scam, Siddiqi's representations as set forth above that the particular transaction at bar would be "safeguarded" were obviously therefore misrepresentations to Plaintiff.

108. Upon information and belief, Siddiqi presented this information to Plaintiff knowing that it was materially misleading.

---

[4] https://www.the-sun.com/news/3990583/ppe-thailand-skymed-paddy-the-room-louis-ziskin/
[5] https://www.ien.com/regulation/news/21808995/thai-companies-accused-of-fraud-in-sales-of-medical-gloves

109.   Plaintiff, reasonably relying on Siddiqi's professed expertise as well as material representations that the Project was "safeguarded" by a purported ironclad letter of credit, was damaged in an amount as aforesaid.

110.   Accordingly, like the Defendants' other willful and contumacious conduct and representations to induce investment set forth above, Defendants statements were therefore not only used for the reason to target and solicit the investors' initial investment, but were apparently continuous and pervasive from start to end.

## STANDARD CHARTRERED BANK
## AIDING AND ABETTING FRAUD

111.   In or around March, 2021, when it became clear that the transaction to buy "Nitrile gloves" would not occur after the time elapsed for the expected shipment to arrive at the point of destination in Dubai, upon information and belief, Nursat Khan sought to effect cancelation of the letter of credit.

112.   In connection therewith, Nursat Khan, upon information and belief, communicated to Standard Chartered Bank that the transaction relating to the "Nitrile Gloves" evidenced fraud, and was thus defunct; and also communicated that the letter of credit should not be honored by the receiving bank nor anyone else because the conditions for payment failed, and also the seller would not meet any of the criteria agreed upon by the parties.

113.   As formerly set forth herein, Standard Chartered Bank was required to issue payment after the beneficiary conformed to certain conditions.

114.   Upon information and belief, none of those conditions were met.

115.  Upon information and belief, Standard Chartered Bank proceeded with an investigation, but did not issue a "stop" order as a result of the alleged fraud relating to the letter of credit.

116.   Upon information and belief, the LC holder relating to the purported seller of the "Nitrile Gloves" failed to and did not meet any of the criteria agreed upon by the parties as relating to the letter of credit.

117.   Upon information and belief, as set forth previously, with a formal LC in hand, the LC holder who represented he was a seller of "Nitrile Gloves" was able to turn the LC into cash using a secondary scam

118.   Upon information and belief, the secondary scam resulted in a the debiting of at least part of Plaintiff's monies deposited in Standard Chartered Bank as a result of the secondary scam.

119.   Upon information and belief, at some point after March 5, 2021, Standard Chartered Bank that had received a claim to draw down the remaining money in the letter of credit by Nursat Khan.

120.   Upon information and belief, Standard Chartered Bank proceeded with the draw down of the remaining monies in the account and forwarded them to Nursat Khan, despite already having knowledge of the alleged underlying fraud advised by him; as well as the secondary scam relating to debiting the by the LC holder.

121.   Upon information and belief, Standard Chartered Bank knew or was reckless in not knowing about the rampant scams, particularly with PPE fraud at the height of the COVID pandemic.

122.   Upon information and belief, as set forth formerly herein, Nursat Khan gave the draw down proceeds to Amin, who misused, squandered, or converted the proceeds during one of his two trips to Dubai, which is world-renowned as one of the world's most opulent destinations

123.   On or about late August, 2021, Amin and Siddiqi informed Plaintiff Davidoff that the letter was expired and there was no means to retrieve any of Plaintiff's remaining monies.

124.   On or about the same time, Amin and Siddiqi cut off all contact with Plaintiff.

125.   As a result of the foregoing, Plaintiff suffered the loss totaling $61,595.31 as a direct result of the totality of all of the Defendants' actions and omissions.

126.   The Plaintiff is wholly ignorant of the amounts of monies pilfered by the non-party LC holder and purported seller of the "Nitrile Gloves"; by the amounts converted by Defendants Siddiqi and Amin and still in the possession of the Defendants Siddiqi and Amin; by the amount of monies squandered and misused by Defendants by means of their purported trips to Dubai or otherwise misused by Defendants in furtherance of their scheme to defraud, except that, upon information and belief, Defendants Siddiqi and Amin squandered, misused, and converted at the very least one-half of the monies invested by Plaintiff. Accordingly.   Plaintiffs herein are entitled to a sum of money of at least $61,595.31, as was Plaintiff's contribution to Defendants' scheme to defraud.

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT SIDDIQI, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:**

**(Constructive Trust)**

127.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

128.  That Siddiqi and Amin made the following promises to Plaintiffs:

A)  That the deposit of $81,595.31 Plaintiffs would be held until such time as the rubber gloves were safely dispatched from the exporting country;

B)  That the deposit monies would then be applied towards the purchase of the inventory for resale at a profit in the U.S.A.

129.  That Defendant did not fulfill said promises.

130.  That Plaintiffs made the payment to Defendants based upon said promises.

131.  That Defendants have been unjustly enriched by having taken at least a portion of the deposit for their own use and benefit.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST
THE DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE
AND ALLEGE THE FOLLOWING:**

**(Fraud)**

132.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

133.  The Defendants intentionally made the aforesaid misrepresentations of fact to Plaintiff.

134.  That the representations were made in furtherance of the scheme to defraud Plaintiffs.

135.   The misrepresentations of fact by the Defendants were known to be false by the Defendants at the time made.

136.   That the intent of the Defendants was to induce Plaintiffs' reliance upon the statements of fact and specifically to provide Defendants money for a particular purpose.

137.   Plaintiffs' reliance upon the misrepresentation by the Defendants was justifiable.

138.   Plaintiffs suffered substantial harm by and as a result of the Defendants' actions false representations.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Deceit)

139.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

140.   Defendants made false affirmations to Plaintiffs.

141.   That the false affirmations were with the scienter and intent to defraud the Plaintiffs.

142.   Plaintiffs suffered damages as a result.

### AS AND FOR A  FOURTH CAUSE OF ACTION AGAINST THE DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Money Had and Received)

143.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

144.  Defendants received money rightfully belonging to Plaintiffs.

145.  The Defendants benefited from the receipt of the money.

146.  Equity and good conscience dictate that the money cannot be kept by Defendants.

<u>**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:**</u>

<u>**(Unjust Enrichment)**</u>

147.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

148.  Defendants have been enriched in the sum of their fees paid by Plaintiffs; the monies squandered, converted, and misused by Defendants.

149.  Defendants have benefited from Plaintiff's provision of monies with regard to amounts converted by Defendants Siddiqi and Amin and still in the possession of the Defendants Siddiqi and Amin; by the amount of monies squandered and misused by Defendant Amin by means of opulent trips to Dubai.

150.  Defendants have been enriched at the expense of Plaintiffs.

151.  In equity and good conscious, Defendants cannot be permitted to retain

Plaintiffs' money.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Negligent Misrepresentation Causing Harm)

152.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

153.   That Defendants were aware that their statements to Plaintiffs were to be used for a particular purpose by Plaintiffs.

154.   That the statements were made to Plaintiffs who has a relationship so close to Defendants as to approach that of privity.

155.   That Plaintiffs relied upon the Defendants on the statements.

156.   That Plaintiffs relied on the statements in furtherance of a purpose.

157.   Defendants engaged in conduct regarding the statement linking it to the Plaintiffs.

158.   That Defendants understood there is reliance upon the statement.

159.   That Plaintiffs have been damaged by the reliance.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST THE DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Promise Causing Detrimental Reliance)

160.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

161.  Defendants made clear and unambiguous promises to Plaintiffs.

162.  There was reasonable and foreseeable reliance on the promise.

163.  That said reliance was by the Plaintiffs to whom the promise was made.

164.  That there was an injury sustained by Plaintiffs based upon the reliance on that promise.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST THE DEFENDANTS SIDDIQI AND AMIN, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Quasi Contract)

165.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

166.  Plaintiffs rendered performance to or on behalf of Defendants.

167.  That the performance was rendered at the request of Defendants.

168.  That the performance resulted in the Defendants' unjust enrichment.

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST THE DEFENDANTS AMIN AND SIDDIQI, PLAINTIFFS  STATE AND ALLEGE THE FOLLOWING:

### (Aiding and Abedding the Commission of a Tort)

36

169.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

170.  That there was evidence of a violation of Plaintiffs' rights by Defendants.

171.  That there was knowledge of the violation by the Defendants.

172.  That the Defendants substantially assisted the wrongdoing Defendants.

**AS AND FOR A TENTH CAUSE OF ACTION AGAINST THE DEFENDANTS AMIN, SIDDIQI, AND STANDARD CHARTERED BANK, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:**

**(Conspiracy)**

173.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

174.  That Defendants engaged in the tort of fraud.

175.  That the torts were the product of a corrupt agreement among the Defendants.

176.  That there was an overt in furtherance of the agreement among the Defendants.

177.  That Defendants intentionally participated in furtherance of a plan or purpose.

178.  That the Plaintiffs sustained damages as a result.

**AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST THE DEFENDANTS AMIN AND SIDDIQI, PLAINTIFFS  STATE AND ALLEGE THE FOLLOWING:**

**(Breach of Contract)**

179.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

180.  Plaintiffs advanced Defendants money pursuant to particular terms in which they agreed to provide $163,190.62 as a result of an initial investment of $81,595.31.

181.  Defendants have defaulted and failed to repay the promised monies when due.

182.  Pursuant to a particular term, Defendants Siddiqi and Amin failed to repay the Principal.

183.  Accordingly, Plaintiff sustained damages as a result.

## AS AND FOR A TWELVETH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (*In the alternative* Negligence/Gross negligence)

184.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

185.  Defendants owed Plaintiff a duty of care.

186.  Defendants breached that duty by acting recklessly or negligently.

187.  Defendants' reckless acts and omissions directly caused Plaintiff damages.

188.  Plaintiff's damages were reasonably foreseeable to the reasonably prudent person.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION AGAINST THE DEFENDANT STANDARD CHARTERED BANK,

## PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (Aiding and Abetting Fraud)

189.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

190.  Upon information and belief, the individual Plaintiff was listed as the Applicant in the LC.

191.  Upon information and belief, the non-party LC holder that purported to be a seller of "Nitrile Gloves" has committed a fraud by turning the LC into cash using a secondary scam.

192.  Upon information and belief, the secondary scam resulted in debiting of Standard Chartered Bank's account relating to Plaintiff's fund of money used as collateral towards the letter of credit.

193.  Upon information and belief, Standard Chartered Bank agreed to make a draw down on Plaintiff's fund of money deposited towards a letter of credit after it was informed of the allegation of fraud by Nursat Khan; and also after the secondary scam that resulted in debiting Standard Chartered Bank's account relating to Plaintiff's fund of money used as collateral towards the letter of credit

194.  Upon information and belief, Standard Chartered Bank agreed to the draw down the letter of credit despite that Nursat Khan did not present conforming documents relating to the letter of credit, and also with the knowledge of the underlying fraud.

195.  Despite these warnings, Standard Chartered Bank had insisted on not issuing a "stop" order to the letter of credit in order to try and preserve the funds, thereby providing substantial assistance to the non-party LC holder that purported to be a seller of "Nitrile Gloves" in the achievement of the secondary scam; as well as substantial assistance to Siddiqi and Amin's scheme to defraud via facilitating the improper draw down to Nursat Khan, which resulted in Siddiqi and Amin's continued misuse, squandering and conversion of Plaintiff's monies.

196.  As a direct and proximate result, the improper debiting and improper draw down on the letter of credit caused injury to the Plaintiff in the amount of $61,595.31.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests this Court to enter judgment in his favor and against Defendants as follows:

1. Awarding Plaintiff on the claims herein as determined by this honorable Court, but not less than $61,595.31.

2. Granting such other and further relief as the Court deems just and proper, including the costs of this action.

Dated: December 21, 2022

Christopher Rykaczewski, Esq.
*Attorney for Plaintiffs*
97-77 Queens Boulevard, 9th Floor
Rego Park, NY 11374
P: 201-953-4450
F: 718-897-5667